Filed 6/24/26  P. v. Bunton CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICO RASHABB BUNTON,<br><br>    Defendant and Appellant. | H053511<br>(Santa Clara County<br>Super. Ct. No. C2206518) |

Rico Rashabb Bunton was convicted of attempted second degree robbery.  The trial court sentenced him to 16 months in prison.

Bunton appealed, and we appointed counsel to represent him.  Counsel filed an opening brief stating the case and the facts, but raising no issues.  We advised Bunton of his right to file written argument on his own behalf, but received no response.

We have reviewed the full appellate record pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*), with particular attention to certain evidentiary rulings that counsel noted in the fact section of the opening brief.  (See also *People v. Kelly* (2006) 40 Cal.4th 106 (*Kelly*).)  We conclude that there is no arguable issue for appeal and affirm the judgment.

# I. BACKGROUND

## A. The Offense

One morning in March 2022, Kevin Aguilar went to a tattoo shop. He was wearing a jacket and shoes from luxury designer brands, along with three gold chains and gold earrings. Aguilar arrived early for his tattoo appointment, and because the tattooist had not arrived, Aguilar stepped out of the shop to let his mother know he had arrived safely.

While Aguilar was on the phone, he saw a man nearby looking at his jewelry. The man lunged for the chains, pulled at them, and punched Aguilar three times in the face, knocking him to the ground. In addition, when Aguilar would not let go of his chains, the man tried to grab Aguilar's phone.

The attacker walked away, returned to grab hold of Aguilar, left for a second time, and got into a nearby car. Aguilar ran into the tattoo shop and discovered his face was bloodied and one eye blackened. Broken pieces of his jewelry lay on the ground outside, though he later recovered all of them.

Two eyewitnesses, David Trinh and Humberto Vargas, saw the attack. Trinh gave police a 17-second video he had taken showing part of the incident. Vargas gave police a photo of the attacker's license plate, and a surveillance video showing a masked man getting into a silver sedan.

Police put out a warrant for the license plate, and just over a week later a police officer pulled Bunton over. An investigator searched the car and found documents belonging to Bunton and a gaiter-style face mask. The rental company confirmed that Bunton had rented the vehicle.

### B. The Trial

#### 1. *The Charge*

The district attorney charged Bunton by information with one count of attempted second-degree robbery in violation of Penal Code sections 211 and 664.

#### 2. *Motions in Limine*

Before trial, the prosecution filed a motion in limine concerning out-of-court statements by Bunton. The prosecution argued that the statements were inadmissible hearsay unless the prosecution offered them against Bunton. (See Evid. Code, § 1220 [exempting statements "offered against the declarant" from the general prohibition against hearsay].) The trial court agreed, adding that "if he [Bunton] wants to make statements, he's got to testify."

#### 3. *The Evidence*

The case went to trial in May 2023, and over the course of two days the prosecution presented testimony from Aguilar, the two eyewitnesses, and several police officers.

Aguilar did not identify Bunton as his attacker and also acknowledged that he did not identify Bunton at the preliminary hearing. However, Aguilar described the attempt to rob him of his gold chains. In so doing, Aguilar said that he told his attacker, " 'Dude, you got the wrong dude. Like, why you coming after me?' " On cross-examination, defense counsel asked Aguilar if he made these statements in response to the attacker telling him, " 'You're the dude that killed my uncle.' " The court sustained a hearsay objection.

On the next day of trial, defense counsel put her objection to the trial court's hearsay ruling on the record. Defense counsel argued that the attacker's statement was not hearsay because it was not being offered for the truth of the matter asserted—that Aguilar killed the attacker's uncle—and also that the statements fell under, among other

things, the spontaneous statement exception to the prohibition against hearsay. The trial court rejected this argument, asserting that "you are not, as a defense attorney, allowed to bring in statements of your client without him testifying" and that, "if you want to make that assertion that that's the reason for this attack . . . put your client on the stand and let him tell the jury that . . . ."

In addition to presenting testimony from Aguilar, the prosecution presented testimony from the two eyewitnesses to the attempted robbery. Trinh testified that he saw the two men fighting near the tattoo shop. According to Trinh, at one point the attacker approached Trinh's car with a gaiter-style mask pulled down around his neck. However, Trinh could not clearly recall the attacker's face. Trinh also authenticated the 17-second video that he had taken showing part of the attack.

Vargas, the other eyewitness, testified that he saw the fight while he was on his way to work in a store near the tattoo shop. Vargas provided police with a photo of the attacker's license plate and surveillance video from the store where he worked.

The prosecutor also presented testimony from several police officers. Detective Timothy Minkel testified about investigating the crime scene and interviewing Aguilar and other witnesses. Defense counsel attempted to elicit statements from Aguilar about the attacker's use of a mask and from another witness about the appearance of the man who got into the silver sedan, but the trial court sustained the prosecution's hearsay objections. Detective Christopher Santistevan also testified. After Bunton was apprehended, Santistevan found in the rental vehicle Bunton had been driving documents belonging to Bunton and a gaiter-style mask matching Trinh's description of the attacker. Santistevan also confirmed with the rental company that Bunton had contracted for the vehicle.

Finally, the prosecution presented testimony from Robert Durr, an employee of the rental company that owned the attacker's getaway car. Durr confirmed the authenticity of

4

Bunton's rental agreement for the car. When the prosecutor asked when the rental took place, the court stopped the questioning because the rental agreement "speaks for itself."

After the prosecution rested, the defense likewise rested without presenting any witnesses.

In closing, the prosecutor emphasized that Bunton "matches the description of the person in the videos that I've presented to you." Defense counsel in turn emphasized that none of the witnesses had identified Bunton and, alternatively, argued that there was no evidence that the attacker intended to deprive Aguilar of his gold chains and therefore no attempted robbery.

### 4. The Verdict

After deliberating for just under three-and-a-half hours, the jury found Bunton guilty as charged of attempted second degree robbery.

### 5. The Sentence

In June 2025, Bunton was sentenced to 16 months of imprisonment, with credit for 33 days of custody and 32 days of good time. The court waived fines and fees, and it entered a general order of restitution.

Bunton filed a timely notice of appeal.

## II. DISCUSSION

We have reviewed the entire record under *Wende*, *supra*, 25 Cal.3d 436, and *Kelly*, *supra*, 40 Cal.4th 106, with particular attention to the evidentiary rulings counsel noted in his brief.

Counsel's brief pointed out that the trial court sustained the prosecution's hearsay objection to Bunton's question whether the attacker accused Aguilar of killing his uncle. Although it is unclear that Bunton was seeking to present evidence of this accusation to prove the truth of the matter asserted, we need not consider whether the ruling was proper because any error was harmless. Even if the trial court abused its discretion in excluding

5

testimony concerning the attacker's accusation, that error would provide grounds for reversing Bunton's conviction only if he demonstrated a reasonable probability of a more favorable result absent the error. (See *People v. Brooks* (2017) 3 Cal.5th 1, 52; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Bunton cannot satisfy this burden based on the attacker's alleged accusation. Although the alleged accusation suggests that the attacker may have had a motive to do something besides, and perhaps much worse than, attempted robbery, the evidence of attempted robbery was nonetheless overwhelming: Aguilar testified that he noticed a man staring at Aguilar's chains, this man lunged at the chains, and when Aguilar would not let go, the man tried to grab his phone. In addition, while Bunton's counsel suggested that she planned to use the attacker's accusation to argue that Bunton was not the attacker, she did not explain how the accusation would do so, and we have found nothing in the record suggesting that the accusation would have led the jury to find that Bunton was not the attacker, especially in light of the video of the incident and the evidence that Bunton rented the car used by the attacker and was found in the car a week after the incident.

Counsel's brief also highlights the trial court's ruling preventing defense counsel from eliciting testimony from Detective Minkel, the officer who interviewed Aguilar, about a comment by Aguilar about the attacker's use of a mask. Defense counsel contended that this was a spontaneous statement excepted from the prohibition against hearsay. The trial court rejected this contention, reasoning that the statement in question was not spontaneous because Aguilar made it while the police interviewed him after the incident. As the spontaneous statement exception applies only to statements "made spontaneously while the declarant was under the stress of excitement" (Evid. Code, § 1240), we see no arguable basis for contending that the trial court abused its discretion in making this ruling. Although the stress of an event may persist for some time after it

6

concludes, nothing in the record suggests Aguilar remained under the stress of the attack within the meaning of the hearsay exception during the later questioning.

Defense counsel also asked Detective Minkel about another witness's description of the man who got into the silver sedan in which Aguilar's attacker left the scene of the attempted robbery. In response to another hearsay objection from the prosecution, defense counsel contended that the description was being offered to show the statement's effect on the detective. However, the trial court ruled that "the effect on [Minkel] has no bearing on anything in this case." We see no basis for arguing that the trial court abused its discretion in making this ruling.

In addition to reviewing the trial court's hearsay rulings, we have examined the rest of the record, including the trial as well as the sentencing. We find no arguable basis for appeal in these matters and therefore conclude that appellate counsel has complied fully with his responsibilities. (*Wende*, *supra*, 25 Cal.3d at p. 441.)

### III. DISPOSITION

The judgment is affirmed.

_____
BROMBERG, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
DANNER, J.

*People v. Bunton*
H053511